## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KARI BREAZEALE,                          :        Civil No. 1:20-cv-2184
                                         :
            **Plaintiff**                :
                                         :
    **v.**                               :
                                         :        **(Magistrate Judge Carlson)**
KILOLO KIJAKAZI,                         :
**Acting Commissioner of Social Security[1],** :
                                         :
            **Defendant**                :

## MEMORANDUM OPINION

## I.     Introduction

Kari Breazeale's Social Security appeal presented the Administrative Law Judge (ALJ) with conflicting clinical and medical opinion evidence. Breazeale, who was younger worker in her late 20's at the time of the alleged onset of her disability, had a college degree and prior employment as a receptionist and mental health technician. Breazeale also suffered from a schizoaffective disorder which was marked by paranoid features and auditory hallucinations.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

In January of 2018, Breazeale suffered from a severe mental health episode which led her to take an overdose of her psychotropic medications. She was hospitalized for approximately six weeks as a result of this episode but her condition reportedly improved significantly during this period of hospitalization.  Nonetheless, Breazeale, her father, and a treating source described her condition as disabling. However, other significant countervailing evidence indicated that she retained the capacity to perform some work in a low stress environment. In particular, treatment notes and Breazeale's father indicated that Breazeale's condition had continued to improve with treatment following her hospitalization. Those treatment records also described Breazeale's mental state in terms that were not entirely disabling. Breazeale's activities of daily living, which included reading, writing, exercise, and at least one international trip, further suggested that she could perform some sustained work. Moreover, a state agency expert and an examining consulting source found that Breazeale's schizoaffective disorder was not totally disabling.

We are enjoined to apply a deferential standard of review to Social Security appeals, one which simply calls for a determination of whether substantial evidence supported the ALJ's decision. Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), we find

2

that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

On August 25, 2018, Kari Breazeale applied for applied for a period of disability and disability insurance benefits, alleging that she had become disabled beginning on January 18, 2018 as a result a schizoaffective disorder and generalized anxiety disorder. (Tr. 15, 18). Breazeale was born in 1989 and was in her late twenties at the time of the alleged onset of her disability. (Tr. 25). She was a college graduate and held a bachelor's degree. (Tr. 70). Breazeale had prior employment at a receptionist and as a mental health technician at the Wilkes Barre Hospital. (Tr. 71-72, 84).

### A. Breazeale's Clinical History

With respect to these emotional impairments, the clinical record revealed that Breazeale had sought treatment for these conditions from the medical practice of Dr. Matthew Berger beginning in August of 2016. (Tr. 259-60). Breazeale continued to receive care and treatment from Dr. Berger's practice through 2019. It appears from treatment records that Breazeale's primary care-givers were two nurse practitioners, Sarah Kemick and Cynthia Maritato. Over time, the clinical picture that emerged

from Breazeale's care givers was one marked by a fluctuating severity of her symptoms. Thus at various times, Breazeale's symptoms were described as either severe, moderate, or mild. However, substantial evidence supported a finding that her symptoms were generally moderate in nature and had improved following her hospitalization in January of 2018.

Prior to the date of the alleged onset of her disability in January of 2018, clinical notes from Dr. Berger's practice assessed Breazeale's condition as moderately impairing. Thus, between August of 2016 and May of 2017, Breazeale's care givers consistently assigned her global assessment of functioning, or GAF, scores that ranged between 55 and 62. (Tr. 458, 462, 467, 470, 474, 478, 482, 485).[2]

---

[2] These were clinically significant findings. A GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir. 2002); Weller v. Saul, No. 1:19-CV-884, 2020 WL 2571472, at *3 (M.D. Pa. May 21, 2020). However, it should be noted that, by the time of the ALJ's decision in this case "the GAF score was abandoned as an assessment tool by mental health clinicians." Long v. Colvin, No. 1:14-CV-2192, 2016 WL 1320921, at *8 (M.D. Pa. Apr. 5, 2016).

The treatment narratives accompanying these notes also described moderate symptoms experienced by Breazeale in 2016 and 2017. In these treatment notes Breazeale herself described fluctuating symptoms, sometimes reporting improvement in her mental state, (Tr. 462, 464, 468, 496, 500, 523, 527), while on other occasions she stated that her paranoid thoughts and auditory hallucinations had increased in their severity. (Tr. 476, 488, 493, 504, 513). This fluctuating mental state was reflected throughout Breazeale's treatment notes. Thus, she was often described as cooperative, well oriented, fluent in her speech, alert, and it was said that her memory and attention span were normal, realistic, intact and appropriate. (Tr. 462, 466, 470, 474, 478, 482, 490, 494, 498, 502, 511, 515). However, in other instances her memory, judgment, and insight were described as impaired. (Tr. 517, 521, 525). Further, during these treatment sessions her judgment reportedly ranged between normal, fair, impulsive, and limited. (Id.)

In late January 2018, Breazeale experienced a major setback in her mental health when she was hospitalized after taking an overdose of her psychotropic medication. (Tr. 261-444). Breazeale remained hospitalized from January 23 through March 2, 2018. (Id.) During this hospitalization, Breazeale was treated with psychotropic medications and received individual and group counseling and therapy. (Id.) While these treatment records revealed that Breazeale initially presented with

suicidal ideation, paranoid thoughts, and some visual and auditory hallucinations, over time she reported that she no longer was experiencing suicidal thoughts or visual hallucinations. (Id.) Breazeale further stated that her paranoid thoughts and auditory hallucinations had either dissipated or decreased significantly in their frequency and urgency. (Id.)

Following her discharge from the hospital, Breazeale resumed treatment with Dr. Berger's practice where she was seen on a monthly basis. Clinical notes for these monthly treatment sessions spanning from May 2018 through July 2019 consistently described improvement in Breazeale's mental state. (Tr. 531-91). In these treatment sessions Breazeale denied suicidal thoughts and regularly reported improvement in her paranoid ideation. (Id.) She also stated that her auditory hallucinations had improved, decreasing in their frequency and intrusiveness. (Id.) Moreover, Breazeale herself often described her symptoms as mild to moderate in severity. (Id.) Further, Breazeale's care givers reported that she demonstrated improvement in her condition, was fully oriented, and by July of 2019 displayed an intact memory, along with normal attention, concentration, and adequate judgment and insight. (Tr. 590).

## B. **Breazeale's Activities of Daily Living**

In the course of these agency proceedings, Breazeale completed an adult function report On November 1, 2018, which described the ways in which her

6

schizoaffective disorder limited her ability to work. (Tr. 210-17). In this report, Breazeale described herself as semi-athletic, reported that her hobbies included reading, writing, and exercise, indicated that she was able to drive, shop, perform household tasks, and socialize with others, while stating that her mental health conditions affected her memory, concentration and ability to get along with strangers. (Id.) In the course of her testimony at the October 16, 2019 ALJ hearing, Breazeale provided a similar assessment of her impairments and activities of daily living, stating that she read, exercised, cooked, and generally slept well. (Tr. 74-82). Breazeale also reported to the ALJ that she still experienced some auditory hallucinations, particularly when it came to personal grooming, but showered once a week. (Tr. 76-77).

Breazeale's description of her activities of daily living was confirmed by her father, both in a third-party adult functioning report and in his testimony at the October 16, 2019 ALJ hearing. (Tr. 92-105, 201-08). Notably, during the ALJ hearing Breazeale's father acknowledged that while Breazeale still experienced auditory hallucinations her condition had improved. (Tr. 101-103). It was also reported that Breazeale had been able to travel internationally with her family to Amsterdam, albeit while exhibiting some mental health symptoms. (Tr. 105).

### C. **The Medical Opinion Evidence**

Given this mixed and equivocal picture that emerged from Breazeale's treatment history and self-reported activities of daily living,  medical professionals who examined her case reached differing conclusions regarding the degree to which her emotional impairments were totally disabling. At the outset, a non-examining state agency expert, Dr. John Chiampi, reviewed Breazeale's treatment records and opined in February of 2019 that the plaintiff was markedly limited in her ability to perform complex tasks, moderately impaired in her ability to work with others, maintain a schedule, sustain concentration, and adjust to changes in the workplace but retained the ability to complete simple tasks in an ordinary schedule. (Tr. 120-29).

These conclusions were consistent with the findings of Dr. Krista Coons, a consulting, examining source who evaluated Breazeale on December 6, 2018. (Tr. 561-68). Based upon her examination, Dr. Coons concluded that Breazeale was fully oriented and her attention and concentration were intact. (Id.) Dr. Coons assessed Breazeale as possessing average cognitive function but exhibiting mildly impaired memory skills. (Id.) Given this assessment, Dr. Coons concluded that Breazeale would be moderately impaired in dealing with others, and mildly impaired in carrying out complex tasks, but had no limitations in performing simple tasks. (Id.)

The evaluation of one of Breazeale's treating sources, CRNP Cynthia Maritato, stood in stark contrast to these two medical opinions. In reports completed in March and August of 2019, CRNP Maritato opined that Breazeale suffered from multiple marked impairments in the workplace due to her schizoaffective disorder. (Tr. 569-71, 598-601). CRNP Maritato concluded that "Ms. Breazeale's condition/symptoms severely limit her ability to maintain any type of gainful employment." (Tr. 571).

### D.    The ALJ's Hearing and Decision

It is against the backdrop of this evidence that the ALJ conducted a hearing in Breazeale's case on October 16, 2019. Breazeale, her father, and a vocational expert ("VE") testified at this hearing. (Tr. 63-117). Following this hearing on November 4, 2019, the ALJ issued a decision denying Breazeale's application for benefits. (Tr. 12-27). In that decision, the ALJ first concluded that Breazeale met the insured status requirements of the Act and had not engaged in substantial gainful activity since January 18, 2018, the alleged onset date. (Tr. 17). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Breazeale's schizoaffective and anxiety disorders were severe impairments (Tr. 18). At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 18-20).

Between Steps 3 and 4 the ALJ concluded that Breazeale retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can frequently work at unprotected heights and around moving mechanical parts. The claimant is able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work) and the claimant is able to make simple work-related decisions. The claimant can frequently interact with supervisors, occasionally interact with co-workers and never interact with the public. The claimant is able to tolerate occasional changes in the routine work setting and her time off task can be accommodated by normal breaks.

(Tr. 20).

In reaching this RFC determination, the ALJ detailed Breazeale's treatment history, observing that her treatment records contained notations reporting improvement in her condition, and also examined her activities of daily living. (Tr. 20-23). The ALJ also evaluated the medical opinion evidence in light of this clinical record and the plaintiff's self-reported activities of daily living.

At the outset, on this record the ALJ found that the moderate limitations assessed by the consulting examining doctor, Dr. Coons, were persuasive, stating that:

> [T]the claimant also underwent a mental status evaluation with Dr. Coons on December 6, 2018. Upon examination, the claimant was cooperative, she appeared her age and while her posture was tense and

10

rigid, her motor behavior and eye contact were normal. The claimant's affect and mood were anxious but her thought process was coherent and goal directed with no evidence of hallucinations (Exhibit 5F/5). The claimant's memory skills were mildly impaired due to anxiety but she was able to recall 3/3 objects immediately and after delay. The claimant's attention and concentration were intact, her cognitive functioning was average and her insight as well as her judgement were good. The claimant was diagnosed with schizoaffective disorder, panic disorder and agoraphobia and the doctor reported her prognosis as fair (Exhibit 5F/6). Dr. Coons opined that the claimant's ability to understand, remember and make judgments with regard to complex instructions was mildly limited. She opined that the claimant's ability to interact with the public, supervisors and co-workers and respond appropriately to changes in the routine work setting were moderately limited. The undersigned finds this opinion persuasive as it is supported by the rather benign findings within the consultative examination and consistent with the treatment records which show that while the claimant has auditory hallucinations they have improved since hospitalization, her concentration, memory and attention span are all normal and intact and her judgement and insight have improved to adequate (Exhibit 7F/19)

(Tr. 23).

In the same vein, the ALJ deemed the opinion of the state agency medical expert Dr. Chiampi to be persuasive, explaining that:

Dr. Chiampi, the state agency psychological consultant opined that the claimant's "B" criteria were mildly to moderately impaired (Exhibit 1A/6). He opined that the claimant's ability to understand, remember and carry out detailed instructions is markedly limited (Exhibit 1A/8). The doctor opined that the claimant's ability to maintain attention and concentration, perform activities within a schedule, work in coordination with or in proximity of others and complete a normal workday/workweek were all moderately limited. Also moderately limited were the claimant's ability to interact appropriately with the general public, ask simple questions or request assistance and accept

instructions and respond appropriately to criticism from supervisors. The claimant's ability to get along with coworkers or peers without being a distraction and maintain socially appropriate behavior were moderately limited as well. The doctor further opined that the claimant's ability to respond appropriately to changes in the work setting, be aware of normal hazards and set realistic goals were all moderately limited (Exhibit 1A/9,10). The undersigned finds this opinion persuasive as it is supported by a detailed explanation and consistent with the treatment records, which show that the claimant periodically has anxiety and limited judgement. Moreover, the records show that while the claimant does have some auditory hallucinations she reports that as of July 2019 they have been improving and she has been more outgoing (Exhibit 7F/7,17,19).

(Tr. 24).

In contrast, the ALJ concluded that the treating source opinions provided by CRNP Maritato were only partially persuasive. (Tr. 24-25).[3] On this score, the ALJ acknowledged that CRNP Maritato found that Breazeale suffered from multiple marked limitations, but concluded that:

> [T]he medical evidence of record does not support the marked restrictions, especially on the claimant's ability to pay attention or concentrate, rather the records consistently show that for at least the past year the claimant's attention span and concentration were normal (Exhibits 4F/102 and 7F/7,15,19). In addition, the undersigned adjusted the residual functional capacity for the claimant's social interactions to address her testimony and give her the benefit of the doubt as to her social interactions and difficulties.

(Tr. 24).

---

[3] The ALJ's opinion erroneously ascribes one of these opinions to Dr. Berger, but it is clear that CRNP Maritato was the actual author of both opinions.

Having reached these conclusions regarding the medical clinical and opinion evidence, the ALJ found that Breazeale could not perform her past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 25-26). Having reached these conclusions, the ALJ determined that Breazeale had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 27).

This appeal followed. (Doc. 1). On appeal, Breazeale challenges the adequacy of the ALJ's decision, arguing the ALJ erred in the evaluation of the medical opinion evidence. In particular, Breazeale argues that the ALJ misapplied the new medical opinion evaluation regulations and should have expressly addressed the nature of the treating source relationship between CRNP Maritato and Breazeale when evaluating the persuasiveness of these medical opinions. Breazeale also contends that the ALJ erroneously equated improvement in Breazeale's condition with the ability to perform sustained work. This appeal is fully briefed by the parties and is, therefore, ripe for resolution.

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, and mindful of the deferential standard of review which applies here we conclude that the ALJ's decision is supported by

substantial evidence, and thus we will affirm the decision of the Commissioner denying this claim.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In <u>Hess</u>, the court of appeals considered the question of whether

an RFC, which limited a claimant to simple tasks, adequately addressed moderate

limitations on concentration, persistence, and pace. In addressing the plaintiff's

argument that the language used by the ALJ to describe the claimant's mental

limitations was legally insufficient, the court of appeals rejected a *per se* rule which

17

would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B.**   <u>**Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and

recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4,

2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

22

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Substantial Evidence Supports the ALJ's Evaluation of the Medical Opinion Evidence of Record.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Judged against these deferential standards of review, while we consider this a close case, we are constrained to find that substantial evidence supported the ALJ's decision that Breazeale was not entirely disabled.

Breazeale filed this disability application in August of 2018, following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of

medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

While the framework for analysis of medical opinions has changed judicial review

of this aspect of ALJ decision-making is still guided by several settled legal tenets.

First, when presented with a disputed factual record, it is well-established that "[t]he

ALJ – not treating or examining physicians or State agency consultants – must make

26

the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>,

667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ

may choose whom to credit but 'cannot reject evidence for no reason or for the

wrong reason.'" <u>Morales v. Apfel,</u> 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>,

994 F.2d at 1066). Therefore, provided that the decision is accompanied by an

adequate, articulated rationale, it is the province and the duty of the ALJ to choose

which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); <u>Connors v.</u>
> <u>Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). In addition, where there

is no evidence of any credible medical opinion supporting a claimant's allegations

of disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

Moreover, when evaluating a medical opinion from any medical source several other principles apply. For example, the ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the source's actual treatment notes, justifies giving a medical opinion less persuasive power in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

Here, the ALJ complied with the new regulatory scheme when evaluating these medical opinions, and substantial evidence supported this evaluation of the medical opinion evidence. First, the ALJ found that the state agency expert and consulting source opinions were persuasive because those opinions were more congruent with Breazeale's longitudinal treatment history, which was reflected only a moderate degree of impairment and frequently described improvement in the plaintiff's mental health. These findings by the ALJ were supported by substantial

evidence; that is, " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154.  Further, given that "supportability . . . and consistency . . .  are the most important factors [to] consider when [] determine[ing] how persuasive [to] find a medical source's medical opinions . . . to be,"  20 C.F.R. § 404.1520c(b)(2), we find that the ALJ was justified in concluding that these opinions, which found that Breazeale was moderately impaired but could perform some work, were more consistent with the overall clinical record.

In the same vein, the ALJ determined that CRNP Maritato's more extreme opinions, which found that Breazeale suffered from multiple marked limitations, were inconsistent with the treating source's own medical treatment notes. This discrepancy between the treating source opinion and that source's treatment records was a valid consideration for the ALJ to take into account when assessing the persuasive power of these medical opinions, Torres, 139 F. App'x at 415, and substantial evidence supported the ALJ's finding that CRNP Maritato's treatment notes did not describe Breazeale's symptoms with  the degree of severity set forth in her medical opinions.

Given that substantial evidence supported the ALJ's finding that the opinions of Dr. Chiampi and Dr. Coons were more persuasive than the opinions expressed by CRNP Maritato, we conclude that under the Commissioner's new medical opinion

regulations, the ALJ was not required to discuss factors other than supportability and inconsistency when evaluating these medical opinions. 20 C.F.R. § 404.1520c states explicitly:

> The factors of supportability…and consistency… are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be… We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2). Under these regulations, the ALJ is only required to address these additional factors, including the nature of the doctor-patient relationship, if the ALJ concludes that several contrasting opinions are equally persuasive. Id. § 404.1520c(b)(3). The ALJ made no such finding in the instant case. Instead, the ALJ's opinion found the views expressed by Dr. Coons and Dr. Chiampi to be more persuasive that CRNP Maritato's opinion. Having made this finding, the ALJ was not compelled to further examine the other factors enumerated in the regulation. There was no error here.

Finally, Breazeale argues that the ALJ's decision falsely equated improvement in her symptoms with a lack of disability. While drawing such a false equivalence might in some instances warrant a remand, in this case when we read the ALJ's decision as a whole, we find that the ALJ simply cited Breazeale's

improvement in her symptoms as one factor tending to show that she could perform a limited range of simple tasks and therefore was not disabled. Moreover, it is well settled that a documented improvement in a claimant's symptoms is a factor which is relevant to a disability determination. See Forster v. Colvin, 208 F. Supp. 3d 636, 645 (M.D. Pa. 2015). Therefore, the ALJ did not err in considering Breazeale's improved symptoms, along with all of the evidence, in making this disability determination.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence, a term of art which means less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the plaintiff's skillful argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting

31

Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.  **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 24, 2022

32